## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

NORMAN ADKINS,                                              :

                              Case No. 3:10-cv-354

              Plaintiff,

                              District Judge Timothy S. Black
                              Magistrate Judge Michael R. Merz

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
              Defendant.                          :

## REPORT AND RECOMMENDATIONS

        Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

        Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v.*

*Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986).  Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988);  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978);  *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984);  *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSD and SSI on October 17, 2006, alleging disability from July 14, 2006, due to heart failure. PageID 194-99; 200-02; 226. The Commissioner denied Plaintiff's applications initially and on reconsideration. PageID 157-59; 160-62. Administrative Law Judge Thaddeus Armstead held a hearing, PageID 92-143, following which he issued a partially favorable decision finding that Plaintiff was disabled for the period January 14, 2006, through October 30, 2007. PageID 68-86. The Appeals Council denied Plaintiff's request for review of that part of Judge Armstead's decision that was unfavorable, (PageID 62-64), and Judge Armstead's decision became the Commissioner's final decision.

In determining that Plaintiff was not disabled before January 14, 2006, or after October 30, 2007, Judge Armstead found that Plaintiff has severe cardiomyopathy with the residuals of borderline congestive heart failure and adjustment disorder with depressed mood. PageID 78, ¶ 3. Judge Armstead found further that from July 14, 2006, through October 29, 2007, the period during which Plaintiff was disabled, the severity of his cardiomyopathy with the residuals of borderline congestive heart failure medically equalled Listings 4.02A and 4.02B. PageID 80, ¶ 4. Judge Armstead then found that medical improvement occurred as of October 30, 2007, the date Plaintiff's disability ended. PageID 81, ¶ 6. Judge Armstead also found that beginning October 30, 2007, Plaintiff has not had an impairment or combination of impairments that meets or equals the Listings. *Id.,* ¶ 7. Judge Armstead determined that the medical impairment that occurred is related to Plaintiff's ability to work because he no longer has an impairment or combination of impairments that meets or equals the listings. *Id.,* ¶ 8. Judge Armstead then found that beginning October 30,

4

2007, Plaintiff has had the residual functional capacity to perform a limited range of sedentary work. *Id.*, ¶ 9. Judge Armstead then used section 201.28 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and found that since October 30, 2007, there has been a significant number of jobs in the economy that Plaintiff has been capable of performing. PageID 84, ¶ 14. Judge Armstead concluded that Plaintiff was disabled from July 14, 2006, through October 30, 2007, but not thereafter. PageID 85.

Plaintiff was hospitalized June 28-30, 2003, for complaints of chest pain. PageID 261-62. An echocardiogram performed during that time revealed severe left ventricular systolic dysfunction, diffuse severe hypokinesis more prominent in the anterior wall and septum, ejection fraction of 25% to at most 36% diastolic dysfunction of the left ventricle, mild mitral valve regurgitation, and trace tricuspid valve regurgitation with high normal pulmonary artery pressures. *Id.*

A February 20, 2004, EKG was nondiagnostic due to underlying left bundle branch block and revealed a fixed perfusion defect along the anterior wall consistent with myocardial scar, and left ventricular ejection fraction of 31% consistent with hypokinetic wall motion. PageID 263-64.

Plaintiff was hospitalized July 26-27, 2006, for complaints of shortness of breath and water retention. PageID 265-75. At the time Plaintiff was admitted to the hospital, it was noted that he had a history of Factor V Leiden mutation, hypertension, and congestive heart failure and that he demonstrated a jugular venous distention of about 7-8 cm., distant heart sounds, and 1+ pitting edema of the lower extremities bilaterally, greater on the right. *Id.* An echocardiogram performed during that hospitalization revealed that since June, 2003, Plaintiff's left ventricular systolic function

had worsened, and that his mitral and tricuspid regurgitation had worsened from mild to moderate with right ventricular pressure increasing from 28 mmHg to 45+ mmHg. *Id.* Plaintiff was treated and released. *Id.*

Plaintiff was hospitalized August 15-25, 2006, for treatment of dilated as well as ischemic cardiomyopathy with an ejection fraction of 15%, coronary artery disease with an occluded proximal LAD, nonsustained ventricular tachycardia, mitral regurgitation, hypertension, Factor V Leiden deficiency with a deep vein thrombosis of the left lower extremity, and chronic left bundle branch block. PageID 276-95. Plaintiff underwent a cardiac catheterization and placement of a biventricular AICD. *Id.* Plaintiff was treated with medications and at the time of his discharge it was noted that he would not be able to return to his truck-driving job for a couple of months especially with the recent biventricular AICD placement. *Id.*

The record contains the office notes of Plaintiff's treating cardiologists at the Cardiac Specialists of Dayton practice dated August 2, 2006, to August 25, 2009, and where Plaintiff was treated primarily by Dr. Bulow. PageID 297-323; 492-502; 590-600; 652-59; 660-61 . Those notes reveal that when Plaintiff was first evaluated, it was noted that he had tachycardia, a holosystolic murmur, positive fluid shift of the abdomen, 1+ pitting edema extending to his knees, and chronic venous stasis changes on his left leg. *Id.* In December, 2006, it was noted that Plaintiff was doing markedly better after his August hospitalization, his energy levels were normal, and he had occasional postural-related lightheadedness. *Id.* In October, 2007, Plaintiff received treatment for occasional postural lightheadedness, severe fatigue, and shortness of breath. *Id.* In February, 2008, Plaintiff's cardiologist noted that Plaintiff's AICD had been inappropriately shocking him which resulted in a hospitalization and that his ICD settings were adjusted. *Id.* A stress EKG performed

on February 28, 2008, was indeterminate secondary to a paced rhythm.  *Id.*  An echocardiogram performed on March 25, 2008, revealed a mildly to moderately increased ventricular cavity, an ejection fraction of 35-40%, impaired relaxation pattern of LV diastolic filling, and a mildly dilated left atrium.  *Id.*  On October 9, 2008, while undergoing a stress test, Plaintiff went into sustained ventricular tachycardia and an October 29, 2008, stress test was indeterminate secondary to bundle branch block.  *Id.*   Dr. Bulow noted on May 18, 2009, that Plaintiff's diagnoses were ischemic cardiomyopathy with an ejection fraction of 35%, BiV ICD Medtronic, ventricular tachycardia, systolic congestive heart failure, hypertension, and Factor V Leiden deficiency and that Plaintiff had exertional dyspnea and had limited his activities due to his fear of his defibrillator discharging.  *Id.*  An August 25, 2009, echocardiogram revealed en ejection fraction of 45-50%, impaired relaxation pattern of LV diastolic filling, and mild global hypokinesis of the left ventricle.  *Id.*

The record contains the office notes of treating physician Dr. Mullennix dated August 7, 2003, to August 31, 2009.  PageID 325-439; 473-90; 504-79; 601-51; 662-709.  On January 23, 2007, Dr. Mullennix reported that she first saw Plaintiff on August 7, 2003, last saw him on July 31, 2006, and that his diagnoses were dilated cardiomyopathy, coronary artery disease, hypertension, mitral regurgitation, pulmonary hypertension, Factor V Leiden deficiency, status post biventricular AICD, deep vein thrombophlebitis, and hyperlipidemia.  *Id.*  Dr. Mullennix also reported that Plaintiff had a severe impairment, dyspnea on exertion, and that he had limitations due to the AICD implant.  *Id.*  On July 3, 2007, Dr. Mullennix reported that Plaintiff had dyspnea on exertion and after walking one block, heat exacerbated the dyspnea, resting for five to ten minutes relieved the dyspnea, his ejection fraction was 15% as of December 18, 2006, and that he had trace edema and pulmonary hypertension.  *Id.*  Dr. Mullennix also reported that Plaintiff displayed a component of

7

diastolic dysfunction. *Id.* On September 10, 2008, Dr. Mullennix reported that Plaintiff's diagnoses were dilated cardiomyopathy, mitral regurgitation, hypertension, Factor V Leiden deficiency, hyperlipidemia, insulin resistance, and depression, his status was poor but stable, he was able to stand/walk for less than one hour in an eight-hour workday, his ability to sit was not affected by his impairments, and that he was able to lift/carry up to five pounds. *Id.* Dr. Mullennix also reported that Plaintiff was unemployable. *Id.* On April 8, 2009, Dr. Mullennix reported that Plaintiff still had cardiac issues and was unable to work. *Id.*

Examining psychologist Dr. Harris noted on June 11, 2007, that Plaintiff graduated from high school, that Plaintiff reported that he had been depressed since he had a defibrillator implanted in August, 2006, and that he has significant anxiety. PageID 449-52. Dr. Harris also noted that Plaintiff had not received any mental health care but was taking medication prescribed by his family doctor, drank one six-pack of beer a week, smoked a pack of cigarettes a day, did not sleep well unless he drank a six-pack and took a Xanax, and that his energy level was not as good as it used to be. *Id.* Dr. Harris reported that Plaintiff's speech, thought processes, and psychomotor activity were normal, his affect was restricted, his mood was irritable, and his eye contact was good. *Id.* Dr. Harris identified Plaintiff's diagnosis as adjustment disorder with depressed mood and he assigned Plaintiff a GAF of 52. *Id.* Dr. Harris also reported that Plaintiff's abilities to understand and follow instructions, maintain attention to perform simple multi-step tasks, and to withstand the stress and pressure associated with day-to-day work activities were unimpaired and his ability to relate to others was mildly impaired. *Id.*

Plaintiff sought emergency room treatment on October 20, 2008, for a complaint of his defibrillator misfiring. PageID 580-85. Plaintiff's EKG was normal and he was treated and

released. *Id.*

The record contains a copy of Plaintiff's treatment notes from Samaritan Behavioral Healthcare dated September 15-21, 2009. PageID 713-28. Those records reveal that when Plaintiff was first evaluated, he reported that he had sleep problems, was isolating himself, had a depressed mood, low energy, and low interest in activities. *Id.* It was noted that Plaintiff was tearful when talking about the loss of his parents, that he completed school to the tenth grade and had a GED, and that he did not report past psychotropic medication use. *Id.* Plaintiff's diagnosis was identified as major depressive disorder recurrent and moderate and he was assigned a GAF of 58. *Id.*

A medical expert (MA) testified at the hearing that Plaintiff satisfied Listings 4.02(A1) and (B1) during the period June 14. 2006, to October 29, 2007, that as of October 29, 2007, he was up to perhaps a sedentary category of work, and that he still had borderline congestive heart failure. PageID 112-30. The ME also testified that Plaintiff should not lift any more than ten pounds occasionally or five pounds frequently, should not stand for more than two hours during an eight-hour day, was able to sit for six hours, and that he should only occasionally push/pull using his feet and arms. *Id.* The MA testified further that working on an assembly line at a fast pace would be a problem for Plaintiff, he would not be required to elevate his legs while sitting, he had improved quite significantly but still had a heart problem that wasn't going away, and that with any exertion, Plaintiff had more than borderline congestive heart failure. *Id.*

Plaintiff alleges in his Statement of Errors that the Commissioner erred by rejecting the opinion of his treating physician and relying instead on the MA's testimony and by finding that he (Plaintiff) was not entirely credible. PageID 735

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ

9

must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544. "On the other hand, a Social Security Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If

---

FN 1.  Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 582 F.3d at 406, *citing, Wilson,* 378 F.3d at 544, *citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07, *citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407, *citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack*

*of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra,* quoting, *Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

In rejecting Dr. Mullennix' opinion that Plaintiff is disabled, Judge Armstead found that it was not supported by objective findings and was inconsistent with the other evidence of record. PageID 82-83. Judge Armstead relied primarily on the form which Dr. Armstead completed and did not consider her office treatment notes. *Id.*

Dr. Mullennix has been Plaintiff's long-term treating physician and the record contains a copy of her office notes which span a six-year period. Those records reveal that Dr. Mullennix has been treating Plaintiff since before his onset date of January 14, 2006, and since that time she has consistently documented Plaintiff's abnormal physical findings. For example, Dr. Mullennix reported that Plaintiff had 3+ edema bilaterally to his knees, tachycardia, a decreased ejection fraction, that he complained of chest discomfort with exertion, shortness of breath with exertion, dizziness with position changes, and fatigue, and that he had pulmonary edema. In addition, Dr. Mullennix reported that Plaintiff had an implanted defibrillator which had malfunctioned. While Dr. Mullennix' office noted seem to indicate that Plaintiff's condition improved at times, particularly his ejection fraction and the degree of edema which he exhibited, her notes are consistent with respect to the presence of edema, dyspnea on exertion, fatigue, dizziness, and chest discomfort/pain.

Dr. Mullennix' opinion that Plaintiff is disabled is consistent with the findings that Plaintiff's treating cardiologists reported. Those cardiologists have reported over time that Plaintiff had postural-related lightheadedness, severe fatigue, shortness of breath, an abnormal ejection

12

fraction, and that he had an internal defibrillator. In addition, those additions reported that Plaintiff had, *inter alia,* ventricular tachycardia, congestive heart failure, exertional dyspnea, and ischemic cardiomyopathy.

Dr. Mullinnex' opinion is supported by the objective medical test results. For example, the echocardiograms of record consistently revealed that Plaintiff had ventricular dysfunctions, an abnormal ejection fraction, an impaired relaxation pattern of the LV diastolic filling, hypokinesis of the left ventricle, and a dilated left atrium.

The only evidence which arguably conflicts with Dr. Mullinnex' opinion are the opinions of the non-treating, non-examining reviewing physicians and the MA. Under these facts, the Commissioner erred by rejecting Dr. Mullinnex' opinion. Therefore, the Commissioner's decision is not supported by substantial evidence.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits granted. The Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. §405(g). If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted); *see also, Newkirk v. Shalala,* 25 F.3d 316 (6th Cir. 1994).

This Court concludes that all of the essential factual issues have been decided and that the record adequately establishes Plaintiff's entitlement to benefits. Specifically, as noted

13

above, Dr. Mullennix has been Plaintiff's long-term treating physician and she has opined that Plaintiff is disabled.  Additionally, Dr. Mullennix' opinion is supported by her clinical notes and is consistent with  other evidence of record.  Finally, the only evidence which arguably opposes Dr. Mullennix' opinion are the opinions of the non-treating, non-examining physicians and MA.

It is therefore recommended that the Commissioner's decision that Plaintiff is not disabled as of October 30, 2007, be reversed and this matter be remanded to the Commissioner for the payment of benefits consistent with the Act.

June 20, 2011.

s/ **Michael R. Merz**<br>United States Magistrate Judge

## NOTICE  REGARDING  OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).